IN RE APPLICATION A-16642.
NEBRASKA GAME AND PARKS COMMISSION, APPELLEE AND CROSS-APPELLEE, V. THE 25 CORPORATION, INC., APPELLANT, AINSWORTH IRRIGATION DISTRICT ET AL., APPELLEES AND CROSS-APPELLANTS, CITY OF LONG PINE, APPELLEE AND CROSS-APPELLEE, BROWN COUNTY BOARD OF COMMISSIONERS, APPELLEE.

463 N.W.2d 591

Filed November 30, 1990. No. 90-034.

Robert L. Lepp, of McGill, Gotsdiner, Workman & Lepp, P.C., and Richard L. Anderson, of Croker, Huck, Kasher, Lanphier, DeWitt & Anderson, P.C., for appellant.

William B. Cassel, of Cassel & Cassel, for appellees City of Ainsworth, Zwiebel, and Improvement Commission.

Rodney J. Palmer, of Palmer & Kozisek, P.C., for appellees Irrigation District and Development Association.

Dana V. Baker, of Barney, Carter, Johnson & Baker, P.C., for appellee City of Long Pine.

Robert M. Spire, Attorney General, and Linda L. Willard, and Rodney M. Confer, of Knudsen, Berkheimer, Richardson & Endacott, for appellee Nebraska Game and Parks Commission.

Robert M. Spire, Attorney General, and LeRoy W. Sievers for State of Nebraska.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

This is a direct appeal from an order of the Director of Water Resources partially granting the permit requested by applicant-appellee, Nebraska Game and Parks Commission (applicant), for an instream flow appropriation at Long Pine Creek. Objector-appellant, The 25 Corporation, Inc. (25 Corporation), and objectors-appellees and cross-appellants, the City of Ainsworth (Ainsworth), the Ainsworth Irrigation District and the Niobrara River Basin Development Association (hereinafter collectively referred to as Irrigation District), and Donald E. Zwiebel and the Niobrara Basin Environmental Improvement Commission (hereinafter collectively Zwiebel), challenge the order. These objectors-appellees and cross-appellants and the objector-appellant are hereafter referred to as the "complaining objectors." (We note that although Ainsworth and Zwiebel designate themselves as appellants, the first notice of appeal was filed by 25 Corporation. Therefore, Ainsworth and Zwiebel are not appellants but, rather, are appellees and cross-appellants. See Neb. Ct. R. of Prac. 1C and 1E (rev. 1989).)

During the director's hearing, objector-appellee City of Long Pine (Long Pine) reached an understanding with the applicant, as the result of which Long Pine abandoned its objection in return for a stipulation and amendment of the application to reflect that, in accordance with their agreement, the water capable of being captured by Long Pine's municipal water supply facility is ground water and thus not subject to the applicant's appropriation. This stipulation and amendment was approved and accepted by the director over the objections of 25 Corporation and the Irrigation District. Although the Brown County Board of Commissioners objected to the application and is an appellee, it has filed no brief in this court; accordingly, we make no further reference to that entity.

After lengthy hearings, the director granted the application

in part, as more particularly set forth in part II below. Together, the complaining objectors have lodged 32 assignments of error, which can be summarized as claiming that (1) the statutory scheme authorizing instream appropriations, Neb. Rev. Stat. §§ 46-2,107 through 46-2,119 (Reissue 1988), is unconstitutional under Neb. Const. art. XV, §§ 4, 5, and 6; (2) the director misinterpreted and misapplied § 46-2,115(1), thereby erroneously finding that there was sufficient unappropriated water available to meet the application; (3) the director misinterpreted § 46-2,115(2), thereby erroneously determining that the appropriation was necessary to maintain the instream use for which it was sought; (4) the director misinterpreted § 46-2,115(4), thereby erroneously approving an appropriation in excess of that allowed by the statute; (5) the director misinterpreted and misapplied §§ 46-2,115(5) and 46-2,116, thereby erroneously concluding that the appropriation was in the public interest; (6) the director exceeded his authority by changing the upstream boundary of the stream segment from that set out in the application and by setting the new boundary in an arbitrary, capricious, and unreasonable manner; and (7) the director erred in agreeing to and in arbitrarily, capriciously, and unreasonably approving the stipulation between the applicant and Long Pine.

We hold the statutory scheme authorizing instream appropriations to be constitutional and affirm the director's order.

## II. BACKGROUND

The application in question, A-16642, was filed on April 29, 1988. Therein, the applicant seeks a permit for an instream appropriation of water to maintain a naturally reproducing rainbow and brown trout fishery in Long Pine Creek. The creek is a 33-mile-long cold-water tributary of the Niobrara River and is the longest self-sustaining trout stream in Nebraska.

More specifically, the applicant seeks an instream flow appropriation for a segment of the creek between the confluence of Bone Creek and the boundary of Ranges 20 and 21 West, in Township 29 North, Brown County, Nebraska. Three different flows were requested, to be measured at

different points along the segment. The measuring points are referred to as the upper, middle, and lower study sites. The director denied an appropriation at the upper site but granted a 50-cubic-foot-per-second (cfs) appropriation at the middle site and a 60-cfs appropriation at the lower site, as the applicant requested. This is the first instream flow appropriation granted in this state.

## III. ANALYSIS

### 1. CONSTITUTIONALITY OF STATUTES

With the foregoing brief background, we reach the constitutional challenges presented by the first summarized assignment of error, namely, that the statutory scheme permitting instream flow appropriations, §§ 46-2,107 through 46-2,119, violates Neb. Const. art. XV, §§ 4, 5, and 6.

The questioned statutes provide:

> The Legislature finds that the maintenance, conservation, management, storage, and timely release of the waters of the natural streams within the State of Nebraska are in the public interest and are practices essential to the well-being of present and future generations. In furtherance of these practices, the public interest demands the recognition of instream uses for fish, recreation, and wildlife. The Legislature also finds that proposals for future water development should fully consider multiple uses, including instream flows whether from natural flow or from reservoir releases, and recognizes the positive impact of impoundments which can provide significant instream flow benefits.

§ 46-2,107.

> As used in sections 46-2,107 to 46-2,119, unless the context otherwise requires, instream appropriation shall mean the undiverted application of the waters of a natural stream within or bordering upon the state for recreation or fish and wildlife purposes. An instream appropriation may be obtained only by the Game and Parks Commission or a natural resources district and only for that amount of water necessary for recreation or fish and wildlife. The instream use of water for recreation or fish

and wildlife shall be considered a beneficial use of water.
§ 46-2,108.

Each natural resources district and the Game and Parks Commission shall conduct studies to identify specific stream segments which the district or commission considers to have a critical need for instream flows. Such studies shall quantify the instream flow needs in the identified stream segments. Any district or the Game and Parks Commission may request the assistance of the Conservation and Survey Division of the University of Nebraska, the Nebraska Natural Resources Commission, the Game and Parks Commission, the Department of Environmental Control, the Department of Water Resources, or any other state agency in order to comply with this section.

§ 46-2,109.

Following notice and a public hearing, any natural resources district or the Game and Parks Commission may file with the Director of Water Resources an application for a permit to appropriate water for instream flows in each stream segment identified pursuant to section 46-2,109. The application shall include the locations on the stream at which the need for instream flows begins and ends and the time of year when instream flows are most critical. The application shall also provide a detailed description of the amount of water necessary to provide adequate instream flows.

§ 46-2,110.

Prior to taking action on an application for an instream appropriation, the Director of Water Resources shall conduct any studies he or she deems necessary to evaluate the application and shall publish notice of such application at least once a week for three consecutive weeks in a newspaper of general circulation in the area of the stream segment and also in a newspaper of statewide circulation. The notice shall state that any person having an interest may in writing object to and request a hearing on the application. Any such objection and request for hearing shall be filed with the Department of Water

Resources within two weeks of final publication of the notice.

§ 46-2,114.

An application for an instream appropriation shall be approved by the Director of Water Resources if he or she finds that:

(1) There is unappropriated water available to provide for the instream appropriation;

(2) The appropriation is necessary to maintain the instream use or uses for which the appropriation has been requested;

(3) The appropriation will not interfere with any senior surface water appropriation;

(4) The rate and timing of the flow is the minimum necessary to maintain the instream use or uses for which the appropriation has been requested; and

(5) The application is in the public interest.

The application may be granted for a rate of flow that is less than that requested by the applicant or for a shorter period of time than requested by the applicant.

§ 46-2,115.

In determining whether an application for an instream appropriation is in the public interest, the director shall consider the following factors:

(1) The economic, social, and environmental value of the instream use or uses including, but not limited to, recreation, fish and wildlife, induced recharge for municipal water systems, and water quality maintenance;

(2) The economic, social, and environmental value of reasonably foreseeable alternative out-of-stream uses of water that will be foregone or accorded junior status if the appropriation is granted; and

(3) Whether the application is consistent with any applicable state goals for water resource use adopted pursuant to section 2-15,113.

§ 46-2,116.

If the Director of Water Resources determines that there is insufficient unappropriated natural flow available for an application for an instream appropriation and if the

applicant consents, the director shall request the Nebraska Natural Resources Commission to conduct a study to determine whether the instream flow needs can be met through the use of stored water in new storage facilities. The study shall address the availability of storage sites, the estimated cost of providing any required storage, whether storage options would be consistent with the state goals for water resource use adopted pursuant to section 2-15,113, and such other findings and conclusions as the commission deems appropriate.

§ 46-2,116.01.

If the Nebraska Natural Resources Commission determines that instream flow needs can be met through the use of stored water in new storage facilities, the applicant may request financial assistance for the construction of necessary storage facilities from the Nebraska Resources Development Fund or the Nebraska Water Management Fund. The cost of the project may be shared with any other users of the stored water.

§ 46-2,116.02.

An instream appropriation shall be reviewed by the Water Management Board when a project sponsor files an application which meets the criteria of section 2-15,114 and where the project after construction could be denied water for the benefit of the existing instream appropriation.

The Water Management Board shall recommend to the Director of Water Resources whether the state's interest demands the modification of the instream appropriation.

The Director of Water Resources may modify the instream appropriation only in the manner recommended by the Water Management Board, except that the director may find the instream appropriation should not be modified.

§ 46-2,117.

(1) All water used to provide instream flows shall be applied only to that segment of the stream for which the appropriation is granted. The stream segment and the determination of a reasonable and necessary amount of

water required for instream flow purposes shall be defined specifically by the Director of Water Resources in the permit.

(2) After the water allowed for instream flows has passed through the defined stream segment, all rights to such water shall be deemed relinquished and the water shall be available for appropriation.

§ 46-2,118.

Instream appropriations shall be administered in the same manner as prescribed by Chapter 46, article 2, for other appropriations, except that existing reservoirs shall not be required by the Director of Water Resources to release impounded water for instream appropriations. Instream flow appropriations shall not be superior to existing storage rights as provided in section 46-241. Instream appropriations may be canceled as provided in section 46-229.04.

§ 46-2,119.

Before proceeding further, we pause to remind ourselves of the applicable rules of statutory construction. The first of these is that the party claiming a statute to be unconstitutional has the burden of establishing its unconstitutionality. *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990); *State v. LaChapelle*, 234 Neb. 458, 451 N.W.2d 689 (1990). Moreover, a statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989). As a corollary of this rule, we are obligated to endeavor to interpret the statute in a manner consistent with the Constitution. *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987). Finally, unconstitutionality must be clearly established before a statute will be declared void. *State v. Kipf*, 234 Neb. 227, 450 N.W.2d 397 (1990).

The complaining objectors essentially make two constitutional attacks: (a) that an instream flow appropriation, as authorized by the statutes, is not an "appropriation" within the meaning of the Nebraska Constitution; and (b) that certain features of the instream appropriations authorized "directly conflict with the constitutional provisions regulating

appropriations." Brief for Zwiebel at 11. The relevant provisions of article XV are:

> The necessity of water for domestic use and for irrigation purposes in the State of Nebraska is hereby declared to be a natural want.

Neb. Const. art. XV, § 4.

> The use of the water of every natural stream within the State of Nebraska is hereby dedicated to the people of the state for beneficial purposes, subject to the provisions of the following section.

Neb. Const. art. XV, § 5.

> The right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest. Priority of appropriation shall give the better right as between those using the water for the same purpose, but when the waters of any natural stream are not sufficient for the use of all those desiring to use the same, those using the water for domestic purposes shall have preference over those claiming it for any other purpose, and those using the water for agricultural purposes shall have the preference over those using the same for manufacturing purposes. Provided, no inferior right to the use of the waters of this state shall be acquired by a superior right without just compensation therefor to the inferior user.

Neb. Const. art. XV, § 6.

### (a) Appropriation without Physical Diversion

It is clear that nothing in these provisions expressly prohibits appropriations for instream use. The complaining objectors would imply a prohibition from the definition of appropriation. Although they realize that the Constitution does not define the word, they would have us read "[t]he right to divert unappropriated waters of every natural stream for beneficial use" as such a definition. From this, they would then have us conclude that a physical diversion is an essential element of any appropriation, and then reach the further conclusion that because of this, § 6 must be read as prohibiting

instream appropriations.

Before proceeding with an analysis of this argument, it is fitting to recall that neither constitutional nor statutory provisions are open to construction as a matter of course. *Muller v. Thaut*, 230 Neb. 244, 430 N.W.2d 884 (1988); *Gaffney v. State Department of Education*, 192 Neb. 358, 220 N.W.2d 550 (1974). Thus, construction of a constitutional provision is appropriate only when it has been demonstrated that the meaning of the provision is not clear and that construction is necessary. *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987).

The complaining objectors assert their reading of § 6 as limiting appropriations to out-of-stream uses reflects what the framers "plainly intended." Brief for Zwiebel at 12. To shore up their view, the complaining objectors turn to the customs of miners in the early days of water appropriations in the West. In that connection we are constrained to observe that there probably was not much mining going on in Nebraska and that the customs of miners in other jurisdictions are not a compelling ground for overturning a statute. Be that as it may, it appears that in those days an actual diversion of water away from the stream was considered necessary before a use could be perfected into a protected right. We recognize that there are many cases and authorities which still define an appropriation in terms of a physical diversion of water applied to a beneficial use. See, e.g., *Simons v. Inyo Cerro Gordo Co.*, 48 Cal. App. 524, 192 P. 144 (1920); 1 W. Hutchins, Water Rights Laws in the Nineteen Western States ch. 7 at 366 (1971). The complaining objectors urge that this was the view of the framers when § 6 was adopted and that § 6 must therefore be read as requiring such a diversion.

We agree with the complaining objectors' reading of § 6 so far as it recognizes the framers' intent to adopt the doctrine of prior appropriation. This does not, however, mean that we accept the argument that § 6 was intended to prohibit instream appropriations.

Although the language of a constitutional provision is to be interpreted with reference to established laws, usage, and customs of the country at the time of its adoption, its "terms

and provisions . . . 'are constantly expanded and enlarged by construction to meet the advancing affairs of men.' " *State ex rel. Spire v. Public Emp. Ret. Bd., supra* at 179, 410 N.W.2d at 465, quoting *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949).

We have long recognized that §§ 4, 5, and 6 grant constitutional protection to the doctrine of prior appropriation. *Wasserburger v. Coffee*, 180 Neb. 149, 141 N.W.2d 738 (1966), *modified in other respects* 180 Neb. 569, 144 N.W.2d 209. This doctrine was adopted by our Legislature via the irrigation act of 1895, parts of which were later incorporated into Neb. Const. art. XV, §§ 4, 5, and 6. *Wasserburger, supra.*

Prior to the adoption of the appropriation system, water rights in Nebraska were governed by the common-law system of riparian rights. Under the riparian system, only those landowners whose property is adjacent to a body of water have a right to use that water. The rights of all riparians along a given body of water are equal, regardless of when they began using the water. Riparian proprietors could not divert significant flows out of the natural channel of a stream without returning that water to the channel, nor could they apply that water to nonriparian lands. See, generally, *Meng v. Coffee*, 67 Neb. 500, 93 N.W. 713 (1903); *Crawford Co. v. Hathaway*, 67 Neb. 325, 93 N.W. 781 (1903), *overruled, Wasserburger v. Coffee, supra*; 1 R. Clark, Waters and Water Rights §§ 16, 16.1, and 16.2 (1967); 1 H. Farnham, The Law of Waters and Water Rights §§ 62 to 64b (1904); 3 H. Farnham, The Law of Waters and Water Rights §§ 602 to 606 (1904). While this doctrine was well suited to "England's green and pleasant land," where ample rains watered crops and most uses were nonconsumptive, it soon became apparent to settlers that pure riparianism would hinder development in the more arid regions of the American West. See, generally, *Meng v. Coffee, supra*; *Crawford Co. v. Hathaway, supra*; 1 S. Wiel, Water Rights in the Western States §§ 110 to 118 (3d ed. 1911). Nebraska responded to this "natural want" of water by adopting the doctrine of prior appropriation.

The attributes of the appropriative doctrine which

distinguish it from riparianism are its focus on the application of the water to a beneficial use, rather than on the ownership of riparian land, and its use of a first-in-time, first-in-right approach to conflicts between users, as opposed to the riparian system's equality among riparians. The appropriative system permits water use on lands where the riparian system would deny it and protects senior, more established water uses in times of shortage. Adoption of the appropriative system permitted the acquisition of a right to the beneficial use of water based on the seniority of the use, independent of the riparian or nonriparian nature of the land.

Obviously, some type of diversion is necessary in order to use water on nonriparian land; the crucial question, however, is this: Do the laws of Nebraska require a diversion when one is not required by the laws of physics?

As this is the first instream flow appropriation granted, this is the first time this court has been asked to determine whether a diversion is a necessary prerequisite to a valid appropriation. Although a number of courts and authorities have stated that a diversion is a prerequisite, this view has been criticized as being obsolete. See, Comment, *Minimum Streamflows: The Legislative Alternatives*, 57 Neb. L. Rev. 704 (1978); Comment, *The Prerequisite of a Man-Made Diversion in the Appropriation of Water Rights—State ex. rel. Reynolds v. Miranda*, 13 Nat. Resources J. 170 (1973); Note, *Arizona Water Law: The Problem of Instream Appropriation for Environmental Use by Private Appropriators*, 21 Ariz. L. Rev. 1095 (1980). The diversion requirement traditionally served two functions. First, it provided notice to others of the intent to appropriate and, once the appropriation was perfected, of the existence of the appropriation. Comment, 57 Neb. L. Rev. 704, *supra*, citing C. Meyers, A Historical and Functional Analysis of the Appropriation System 7 (1971). Second, the capacity of the diversion works established the maximum amount a user could claim to have appropriated. See, e.g., *Vonburg v. Farmers Irrigation District*, 132 Neb. 12, 270 N.W. 835 (1937).

Since the permit system provides a surer method of providing lasting notice of the existence and quantity of valid appropriative rights, requiring a diversion as a prerequisite

serves no useful purpose. Nebraska's permit system predates the adoption of the constitutional provisions under discussion. Given the principle of constitutional interpretation that each and every clause in a constitution has been inserted for some useful purpose, *Anderson v. Tiemann*, 182 Neb. 393, 155 N.W.2d 322 (1967), *appeal dismissed* 390 U.S. 714, 88 S. Ct. 1418, 20 L. Ed. 2d 254 (1968), we must conclude that the use in § 6 of the term "divert" serves some purpose other than to prohibit nondiversionary appropriations. It seems more likely that the framers chose to use "divert" in order to stress that the appropriative right was independent of riparian ownership. Since § 6 sets forth the other key aspects of the appropriative right, that the water must be put to beneficial use and that priority of appropriation gives the better right, it is reasonable to conclude that "divert" was intended to express the third aspect of the appropriative right, to wit, the ability to take the water away from the stream's locale.

Our conclusion that diversions are not constitutionally required for all appropriations is not aberrant. Of the nine other Western States with constitutional provisions protecting prior appropriation, only two mention diversion: Colorado and Idaho. Comment, 57 Neb. L. Rev. 704, *supra* at 722. Article 15, § 3, of the Idaho Constitution provides that "[t]he right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses, shall never be denied, except that the state may regulate and limit the use thereof for power purposes." Article XVI, § 6, of the Colorado Constitution provides that "[t]he right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied."

Both Idaho and Colorado have faced the question now before us and have rejected the complaining objectors' argument. The Idaho Supreme Court in *State, Dept. of Parks v. Idaho Dept. of Water Admin.*, 96 Idaho 440, 530 P.2d 924 (1974), upheld an instream appropriation against an identical challenge, as did the Colorado Supreme Court in *Colo. Riv. Wtr. v. Colo. Wtr.*, 197 Colo. 469, 594 P.2d 570 (1979).

The Colorado court was unanimous in its determination that a diversion was not required by its constitution. It noted that the

diversion requirement is court-made and that the "reason and thrust" of the constitutional use of "divert" "was to negate any thought that Colorado would follow the riparian doctrine . . . ." *Id.* at 474, 594 P.2d at 573. The Colorado high court was also able to point to earlier cases which indicated that the need to divert was not of constitutional import. *Id.*, citing *Thomas v. Guiraud et al.*, 6 Colo. 530 (1883), and *Larimer Co. R. Co. v. People ex rel.*, 8 Colo. 614, 9 P. 794 (1885) (*Thomas* involved a dam which caused overflow irrigation of a meadow and *Larimer* the storage of surplus waters in the natural channel of the stream; both contain dicta to the effect that an actual diversion is not a prerequisite to finding a valid appropriation).

The Idaho Supreme Court was divided when it determined the constitutionality of Idaho's instream flow appropriation statute. Both the plurality and concurring opinions rejected the notion that physical diversion is a constitutional requirement. The plurality concluded that although the prior statutory scheme "contemplated an actual physical diversion," the instream flow statute created an exception to that requirement. *State, Dept. of Parks v. Idaho Dept. of Water Admin., supra* at 444, 530 P.2d at 928. The concurring opinion spent more time examining the nature of the appropriative right in comparison to riparian doctrine and concluded that the constitutional reference to diversion was intended to recognize the supremacy of the appropriation doctrine over riparianism and not as a limit on the methods of perfecting a water right. *State, Dept. of Parks, supra* (Bakes, J., concurring specially). Two justices dissented, but only one addressed the question of whether diversion was a constitutional requirement. This dissent focused on earlier Idaho cases which spoke of the need to divert water and apply it to a beneficial use; the existing statutory application, permit, and licensing requirements; and the use of the conjunctive in the constitutional grant of the right to "divert *and* appropriate." *Id.* at 451, 530 P.2d at 935 (McQuade, J., dissenting).

Even if we were to conclude that the framers of article XV, § 6, intended to give constitutional protection only to appropriations made by means of a physical diversion, we would not be forced to conclude that such protection prohibits

the Legislature from creating other means of acquiring rights to water. There is nothing in the language of the Constitution which indicates that § 6 is the exclusive means of acquiring a water right. Indeed, we have long held that the adoption of § 6 did not do away with riparian rights. *Wasserburger v. Coffee,* 180 Neb. 149, 141 N.W.2d 738 (1966), *modified in other respects* 180 Neb. 569, 144 N.W.2d 209. Just as Nebraska originally adopted the appropriation doctrine by statute (1895 Neb. Laws, ch. 69, p. 244), the Legislature can, subject to constitutional limitations, including those set forth in § 6, provide for the acquisition of nondiversionary appropriative rights to public water.

### (b) Effects of Instream Appropriation

This brings us to the complaining objectors' second constitutional challenge to the instream appropriation statutes. They argue that the statutes work to deprive them of their constitutional right to divert unappropriated water. They base their argument on Justice McFadden's dissent in *State, Dept. of Parks v. Idaho Dept. of Water Admin.*, 96 Idaho 440, 530 P.2d 924 (1974), and on the similarities between the relevant provisions of the Nebraska and Idaho Constitutions.

The short and perhaps overly simplistic answer to that argument is that the Constitution only protects the right to divert unappropriated water, and once there has been an instream appropriation, that water is no longer "unappropriated." The more complete answer is that Justice McFadden's approach is inapplicable to Nebraska law.

The complaining objectors argue that the instream appropriation statutes permit the state to withdraw water from appropriation in violation of the command of § 6 that "[t]he right to divert unappropriated waters . . . for beneficial use shall never be denied except when such denial is demanded by the public interest." They rely on the following language from Justice McFadden's dissent:

> I recognize that the state, acting in its proprietary capacity, may appropriate water without offending Article 15, section 3; but as in the case of private appropriators, the state's appropriative right depends

upon the application of water to a "beneficial use." In this case, however, the state agency is directed to hold unappropriated waters "in trust for the people of the state" for "scenic beauty and recreational purposes." [Citation omitted.] If the state were to hold unappropriated waters in trust for these purposes, it certainly would not be acting in a proprietary capacity; it would be doing nothing more than it already had a duty to do in its sovereign capacity. [Citations omitted.]

"[T]he title to the public waters of the state is vested in the state for the use and benefit of all the citizens of the state * * *. This is not, however, an interest or title in the proprietary sense, but rather in the sovereign capacity *as representative of all the people for the purpose of guaranteeing that the common rights of all shall be equally protected* and that no one shall be denied his proper use and benefit of this common necessity." [Citation omitted.]
. . . In my view, the in-stream use of a natural stream for recreational purposes and for scenic beauty is a public beneficial use which inheres in the state's sovereign ownership of such water. Therefore, since the state already has the right to so use the water, it cannot acquire the right to "appropriate" the water for these purposes.

. . . To allow the state to in effect reserve water from appropriation in furtherance of non-proprietary, non-power purposes—when the framers of the Constitution contemplated that private beneficial users could appropriate water being held by the state in its sovereign capacity—amounts to nothing less than a denial of the constitutional right to appropriate the "unappropriated waters" of any natural stream. "In other words, the state cannot by legislative act authorize its own agency to *monopolize or withdraw the very rights that section 3 of article 15 of the Constitution says 'shall never be denied' the people of the state*." [Citation omitted.]

(Emphasis in original.) *State, Dept. of Parks, supra* at 452-53, 530 P.2d at 936-37.

This reasoning is inapplicable to Nebraska law for several reasons. First, the cases supporting the propositions upon

which Justice McFadden relies are all Idaho cases and are not precedent in Nebraska. The complaining objectors have failed to demonstrate that there are any analogous Nebraska precedents. Second, the statutory scheme before us does not provide for the holding of "unappropriated waters 'in trust for the people of the state' " but, rather, authorizes an instream appropriation of the public water for particular beneficial uses. Third, and most important, Nebraska's Constitution expressly provides for a public interest exception to the right to divert. Justice McFadden's conclusion that the Idaho statute was unconstitutional was based on the fact that the Idaho Constitution, "[u]nlike the constitutions of some other western states . . . makes an exception [to the right to appropriate] only for power purposes—*not for the demands of the public interest* . . . ." (Emphasis supplied.) *Id*. at 453, 530 P.2d at 937.

Unlike that of Idaho, Nebraska's constitutional right to appropriate can and must be limited by the demands of the public interest. Neb. Const. art. XV, § 6. The instream flow appropriation statutes can be viewed as a mechanism for determining whether the public interest demands that the right to appropriate water from a given stream should be denied. This view is supported by the fact that the statutory scheme includes a legislative finding that "the public interest demands the recognition of instream uses for fish, recreation, and wildlife," § 46-2,107, and requires the Director of Water Resources to find that the instream flow appropriation is in the public interest. §§ 46-2,115 and 46-2,116.

Anticipating this conclusion, the complaining objectors argue that § 6 requires a new and independent weighing of the public interest each time a new appropriation is requested and does not permit the state to make a determination of the public interest which would bind future applicants for appropriations. They assert that the statutory scheme "adopts a permanently fixed notion of the public interest contrary to Article XV, section 6 of the Nebraska Constitution." Reply brief for Zwiebel at 14. This "notion of the public interest" is not as "permanently fixed" as the complaining objectors seem to believe, nor do the instream appropriations granted under the statutes enjoy a permanent status, as they assert. Like any other

appropriation, an instream appropriation can be canceled. See § 46-2,119 (subjecting instream appropriations to cancellation provisions of Neb. Rev. Stat. § 46-229.04 (Reissue 1988)). In addition, an instream flow appropriation can be modified in favor of water development projects which meet the criteria of Neb. Rev. Stat. § 2-15,114 (Reissue 1987), if the state's interest demands a modification. See § 46-2,117.

Additionally, the complaining objectors fail to consider the possibility of the state's abandoning or relinquishing its right to a particular appropriation if the public interest so demands. They also seem to overlook that the instream appropriation is a statutory creature, and, as such, its attributes can be amended by statute. If the Legislature should one day determine that the public interest has changed and no longer requires instream appropriations, it can return to the individualized determinations championed by the complaining objectors.

The view that § 6 demands individual, case-by-case determinations of the public interest for each new application is a narrow and parsimonious interpretation of the constitutional language and, as such, conflicts with the rule that constitutional provisions should receive a broad and liberal interpretation. *Nebraska P. P. Dist. v. Hershey School Dist.*, 207 Neb. 412, 299 N.W.2d 514 (1980). The language of § 6 does not compel a continuing, case-by-case determination. The relevant clause of § 6 simply permits the state to deny appropriations based upon the dictates of the public interest. It does not prescribe the manner by which the public interest is to be determined nor the mechanisms by which it may be accomplished.

The complaining objectors also claim that permitting instream appropriations conflicts with § 6 by granting "large water appropriators the right to request modifications, while denying that right to smaller appropriators who would otherwise have a higher priority." Brief for Zwiebel at 17. However, they do not specify how this conflict is created. If they are attempting to raise an equal protection argument, the claim, since no suspect or quasi-suspect classification is involved, would be subject to rational basis review. The Legislature can rationally determine that the public interest in a project which will cost over $10 million and which seeks state

funding (two of the criteria of § 2-15,114) is more likely to outweigh the public interest in an instream flow appropriation than would a smaller, private appropriator's use.

Finally, the complaining objectors assert that the public interest test of § 46-2,116 fails to meet the level of necessity required by the Constitution. It does not do so, in their view, because it does not require that the economic, social, and environmental value of the instream use exceed that of the reasonably foreseeable out-of-stream uses forgone or afforded to junior appropriators, but merely requires that the director consider these factors. This argument is unpersuasive. First, the Legislature has already found that the public interest demands the recognition of instream uses for piscatorial and other purposes. § 46-2,107. The complaining objectors do not challenge this finding. Second, the director must consider other factors besides the relative value of the uses; he must also consider whether the application is consistent with state goals for water resources use. § 46-2,116(3). The complaining objectors' interpretation ignores this consideration, even though it is a valid factor in determining the weight of the public interest in the appropriation.

For all the reasons set out above, the complaining objectors have failed to satisfy their burden of demonstrating the questioned statutes to be unconstitutional, and, therefore, their constitutional challenges fail.

## 2. AVAILABILITY OF UNAPPROPRIATED WATER

The second summarized assignment of error asserts that as the result of his misinterpretation and misapplication of § 46-2,115(1), the director erroneously found there was sufficient unappropriated water available to meet the application.

The U.S. Geological Survey has two gauges measuring discharge along Long Pine Creek: the Riverview gauge and the Long Pine gauge. Discharge records for the Riverview gauge date back to 1948, while those for the Long Pine gauge date back to 1979. The discharge records for the Riverview gauge show that the creek's discharge rate has increased since the development of the Irrigation District in the 1960s. This

increase varies from 10 to 15 cfs in the winter to over 25 cfs in the spring and summer. The Irrigation District advised at oral argument that it has never attempted to recapture this seepage or presented to the Department of Water Resources any claim for the seepage.

Using the data from the Long Pine and Riverview gauges and from flow measurements at various other sites along the creek, the applicant was able to compute the flows at the study sites. The average annual flow at the middle site is 85 cfs, while that at the lower site is 108 cfs. These flows are subject to five senior appropriations, totaling 12.14 cfs.

The Irrigation District's water comes from Merritt Reservoir via a 52.8-mile canal, under a contract with the U.S. Bureau of Reclamation. Article 7c of this contract states:

> The United States claims all of the waste, seepage, and return flow water derived from water delivered pursuant to this contract and the same is hereby reserved and retained by the United States for beneficial use on the Ainsworth Unit or any other unit of the Missouri River Basin Project which employs the water of the Niobrara River and its tributaries for irrigation purposes.

Framing their assignment as a question of statutory interpretation, the complaining objectors assert that the director erred in determining that there was sufficient unappropriated water. As noted previously in part III(1)(a), constitutional and statutory provisions are not open to construction as a matter of course; it must be demonstrated that the meaning is not clear and that construction is necessary.

As applied to the facts before us, there is nothing unclear in the statutory language. Section 46-2,115(1) requires that the director determine that "[t]here is unappropriated water available to provide for the instream appropriation" before the application can be granted. In *In re Application A-15738*, 226 Neb. 146, 154, 410 N.W.2d 101, 107 (1987), we stated that " 'unappropriated water' is that water which is available for appropriation because it is not subject to an existing appropriation right." In the case before us the director determined the amount of unappropriated water available by subtracting the amount of senior appropriations from the

average annual flow at the two relevant study sites. Since the amounts of unappropriated water thus determined exceed the amounts sought to be appropriated at those sites, the director concluded that more than enough unappropriated water is available to meet the appropriation he granted. Using the same computation based upon the record low flow at the Long Pine gauge, he determined that even during periods of low flow, sufficient unappropriated water is available.

The complaining objectors further argue that the director committed error by failing to consider whether potential future uses of ground water or possible changes in climatic circumstances may diminish the amount of water available to the instream use in the future. They urge us to interpret § 46-2,115(1) as requiring consideration of these factors. In all their discussion of this issue, the only basis the complaining objectors offer to demonstrate that the director failed to consider these factors is the fact that the director found that there is unappropriated water available, despite the testimony of their witnesses. Although the complaining objectors attempt to frame this as a question of law, it is in truth a factual question. Thus, our review is limited to whether the director's determination is supported by competent and relevant evidence and is not arbitrary, capricious, or unreasonable. *In re Applications T-61 and T-62*, 232 Neb. 316, 440 N.W.2d 466 (1989).

Simple mathematics shows that there is unappropriated water in the creek which exceeds the amount requested in the portion of the application granted. There is copious evidence of the creek's rate of discharge; for one point along the creek the records date back to 1948. There is evidence that the lowest monthly median discharge at the middle site is 71 cfs, while that at the lower site is 94 cfs. Subtracting the senior appropriative rights of 12.14 cfs leaves a lowest monthly median discharge of 58.86 cfs at the middle site and 81.86 cfs at the lower site, 8.86 cfs and 21.86 cfs more than the amounts requested for the respective sites. Although there may be occasions when the flow drops below that requested, absolute dependability is not required; the supply need only be "fairly continuous and dependable." *In re Application A-15738, supra* at 156, 410

N.W.2d at 108. The foregoing evidence demonstrates a fairly continuous and dependable historical flow in excess of that requested.

The evidence concerning the aquifer which feeds the creek is sufficient to support a determination that the water supply in the creek will remain reasonably dependable even in the face of drought and increased ground water withdrawals. The applicant's hydrologist testified as to the size and thickness of the aquifer and gave his opinion that a "very substantial" drought or a "very exceedingly large amount of groundwater pumping" would be needed before there would be any significant water level declines. Although the director's order does not mention this testimony in his discussion of the availability of unappropriated water, it is quoted in the public interest discussion where the director concluded that these statements "were not effectively disputed by other witnesses."

We therefore conclude that the director's determination that there is sufficient unappropriated water available for the instream appropriation is supported by the evidence. We should stress that we are not deciding whether the statute requires a finding that the availability of water for the instream appropriation will not be adversely affected by subsequent events; such a decision must await a case where the issue is determinative of the propriety of an appropriation.

The Irrigation District argues that it has a right to the seepage and return flow from its operations, that these flows amount to approximately 20 to 25 cfs, and that this amount should have been subtracted from the amount of unappropriated water available for the instream appropriation. It points to its contract with the U.S. Bureau of Reclamation in which the United States claims all the waste, seepage, and return flow from the water it delivers. The provision appears to be a relinquishment by the Irrigation District to the United States of any right the Irrigation District might have to seepage. How the Irrigation District has come to view this as granting it a right to the seepage is not made apparent. The United States is not a party to this action and, as far as the record reveals, is not attempting to exercise its contractual right against the Irrigation District. Even if the Irrigation District were able to stand in the

shoes of the United States, its rights as against anyone not a party to the contract are defined by state law, not by the terms of the contract, for federal law specifically defers to state appropriation laws in determining the right of the United States to appropriate water within a state. See, 43 U.S.C. § 383 (1988); *Northport Irr. Dist. v. Jess*, 215 Neb. 152, 337 N.W.2d 733 (1983); *California v. United States*, 438 U.S. 645, 98 S. Ct. 2985, 57 L. Ed. 2d 1018 (1978). Therefore, any right the Irrigation District may have to the seepage and return flows must be based solely on state law.

The Irrigation District cites *United States v. Tilley*, 124 F.2d 850 (8th Cir. 1941), to support its claim to the seepage and return flow. In *Tilley*, the United States claimed that Nebraska had no right to interfere with its collection and reapplication of seepage from the North Platte Irrigation Project. The eighth circuit court agreed and reversed a lower court's denial of an injunction. This court, however, dismissed a similar injunction in *Northport Irr. Dist. v. Jess, supra*. The Irrigation District claims its situation "is nearly . . . identical" to that in *Tilley*, brief for Irrigation District at 35, while the applicant finds *Northport* to be more on point. The main factual difference between the situations in *Tilley* and *Northport* was that *Tilley* involved collection of seepage from drains and ditches on the land connected with the project, while *Northport* involved collection directly out of a watercourse. In the situation before us, the Irrigation District has not yet attempted to recapture and reapply the seepage upon which the applicant is relying, either from ditches in the district or from the creek itself. *Northport* stands for the principle that once seepage reaches a watercourse via natural means, it becomes public water and is subject to appropriation. *Northport, supra*. That Long Pine Creek is a watercourse is not disputed. Clearly, any seepage which affected the director's determination of the available flow had already reached the stream. As such, it is available for appropriation.

Whether the Irrigation District may recapture the seepage before it reaches the creek is a matter which is best left for later adjudication. Since no attempt to recapture has been made and no attempts have been made to prevent the Irrigation District

from recapturing seepage, the issue is not ripe. In addition, it is possible that there are downstream appropriators who have been relying on the return flows; if so, they would be necessary parties to any determination of the Irrigation District's rights to the return flow. See *Northport, supra*.

Complaining objector Irrigation District also asks that this court "provide proportional benefits according to the legislative directives in Section 46-295 and make such provisions for the . . . Irrigation District as [the court] deem[s] necessary, basic and fair under the circumstances." Brief for Irrigation District at 40. We are at a loss to find any legislative directive to provide proportional benefits in Neb. Rev. Stat. § 46-295 (Cum. Supp. 1990), which recites a variety of legislative findings. So far as we can glean from its brief, the Irrigation District's request rests on the following language found in § 46-295:

> The Legislature acknowledges that rights to water intentionally or incidentally stored underground and rights to withdrawal of such water should be formally recognized and quantified and recognizes the propriety of all beneficiaries proportionately sharing, to the extent of potential benefit from intentional underground water storage, in the financial obligations necessary for construction, operation, and maintenance of water projects which cause intentional underground water storage.

The first clause of this sentence simply concedes that rights to this water should be recognized. The remainder of the sentence states that it is proper for beneficiaries of intentionally stored ground water to share the costs of such storage. The Irrigation District focuses on the phrase "the propriety of all beneficiaries proportionately sharing" and then reads "propriety" as "property." Research shows that propriety was once synonymous with property; however, such usage is now obsolete. The most recent example of this usage, cited in XII The Oxford English Dictionary 655 (2d ed. 1989), is dated 1827, which predates the subject statute by some 156 years.

The statute does, however, voice a legislative finding that rights to intentionally and incidentally stored ground water

should be recognized and quantified. The Irrigation District claims the director failed to recognize its rights to incidentally stored ground water. Neb. Rev. Stat. §§ 46-226.01, 46-226.02, and 46-297 (Reissue 1988) provide procedures for the recognition of such rights. The Irrigation District has not attempted to follow these procedures and has failed to demonstrate how granting the appropriation would adversely affect these claimed rights, were they recognized. In light of this, the Irrigation District has no basis for claiming that the director's failure to recognize its purported rights was arbitrary, capricious, or unreasonable.

### 3. NECESSITY OF APPROPRIATION

The third summarized assignment of error claims the director misinterpreted § 46-2,115(2) and thus erroneously determined that the appropriation was necessary to maintain the instream use for which it was sought.

There was unchallenged evidence of the existence of adult trout and trout reproduction in the area of the lower and middle study sites. There was also testimony from a number of witnesses, including some of the applicant's, that there was no imminent threat to these trout and their reproductive efforts.

Before an application for an instream appropriation can be approved, the director must determine that "[t]he appropriation is necessary to maintain the instream use or uses for which the appropriation has been requested." § 46-2,115(2). The complaining objectors contend that the director misinterpreted the statute when he concluded that it did not require a showing of an imminent threat to the use. The applicant, on the other hand, contends that such a reading would defeat the very purpose of the statute.

The meaning of a statute is a question of law, *State v. Ewing*, 221 Neb. 462, 378 N.W.2d 158 (1985), and this court is obligated to reach its conclusions on such questions independent of the determination made by an administrative agency, see *Hillcrest Country Club v. N.D. Judds Co., ante* p. 233, 461 N.W.2d 55 (1990). The meaning of a statute is ascertained, when possible, from the language of the act. *Peterson v. Minden Beef Co.*, 231 Neb. 18, 434 N.W.2d 681

(1989). The language is to be considered in its plain, ordinary, and popular sense. *Georgetowne Ltd. Part. v. Geotechnical Servs.*, 230 Neb. 22, 430 N.W.2d 34 (1988).

Unfortunately, "necessary," particularly when used in a statute, may mean anything from "indispensable" to "convenient." *Banks v. Board of Education of Chase County*, 202 Neb. 717, 277 N.W.2d 76 (1979). In order to construe the statute, we must look to its purpose and give the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. See *Nuzum v. Board of Ed. of Sch. Dist. of Arnold*, 227 Neb. 387, 417 N.W.2d 779 (1988). Clearly, the purpose of the statutory scheme before us is to provide a means for protecting instream uses for fish, recreation, and wildlife.

Would application of the complaining objectors' construction defeat this purpose? If an instream flow appropriation could only be obtained after showing an imminent threat to the use to be protected, the use may well be irreparably harmed or even destroyed before an application is granted. In the case before us, the application was filed in April 1988. The director's order granting the application was entered in December 1989, 1 year 8 months later. If we add to this the amount of time consumed in making the studies to justify the appropriation, the timelag becomes even greater. If the applicant had waited until there was an imminent threat to the fishery before making its application, there would be few trout left in the stream to protect. In addition, when the threat is one due to or exacerbated by overappropriation, once the water is appropriated out of stream it is too late. The instream appropriation can preserve only unappropriated water; it cannot undo existing appropriations. For these reasons it is apparent that the complaining objectors' construction would defeat the very purpose of the statute, and because of this it must be rejected.

A more reasonable interpretation in light of the purposes of the legislation is to read § 46-2,115(2) as requiring a finding of a sufficient causal link between maintaining the flow and maintaining the use for which the flow is requested. This appears to be the approach the director used in his analysis. He

determined that "[b]ecause use of the upper study site by adult trout is very limited and habitat for trout reproduction is nearly absent," the applicant failed to show that that portion of the application was "necessary to maintain a naturally reproducing trout fishery." As to the remaining reach of the application, the director found that the existence of trout reproduction was undisputed and that "at least some instream flow is unquestionably necessary" to maintain naturally reproducing trout habitat.

The director applied the proper standard, and there is no basis for finding his factual conclusions erroneous. The complaining objectors' contention that the director erred in determining that the appropriation is necessary to maintain the use is therefore without merit.

### 4. MINIMUM NECESSARY FLOW

In the fourth summarized assignment of error, the complaining objectors assert the director misinterpreted the meaning of the words "minimum necessary" in § 46-2,115(4) and, because of this misinterpretation, granted an appropriation in excess of that permitted by the statute. Section 46-2,115(4) requires the rate and timing of the flow to be "the minimum necessary to maintain the instream use or uses for which the appropriation has been requested." The complaining objectors assert that this means the flow granted must be the least amount "indispensably required for the continued survival of the fishery," brief for Ainsworth at 20, and that the director instead read "minimum necessary" as meaning appropriate for the use requested. We are again confronted with that protean term "necessary." In this instance, however, it is not necessary for us to construe its meaning. The complaining objectors contend that by granting an appropriation which, under one method for measuring instream flows, would provide "optimum to outstanding" trout habitat rather than mere "survival" habitat, the director approved a flow which was more than the minimum necessary for the use requested. However, the real issue is not what minimum necessary means but, rather, what is the nature of the use for which the appropriation is requested. If the use is to provide a survival

habitat, the director has erred. If, however, the use is to provide for the maintenance of the fishery at its present habitat quality, then the minimum necessary flow is the lowest flow rate which would assure no degradation in the quality of the habitat, and the director's determination is correct if supported by the evidence.

According to a report which accompanied the application, the purpose of the application is to "protect . . . natural flow required to maintain the present fishery." A fishery resource specialist for the applicant testified that the application is intended "primarily to preserve the fishery habitat." From this, it is clear that the use sought to be maintained is not merely the survival of some trout in the stream, but the continued existence of the present fishery. By using words such as "maintain" and "preserve," it is likewise apparent that the application is intended to keep the quality of the fishery from degrading. The rate of flow which is the minimum necessary for the use before us is therefore the lowest rate which would assure no degradation in the quality of the fishery habitat. Clearly, this is something more than the survival habitat proposed by the complaining objectors.

The director notes in his order that his interpretation of the phrase "minimum necessary" is based, in part, on his personal recollections of his own involvement in the drafting and passage of the instream flow statutes. Because the analysis set out above does not rely on the legislative history, we need not reach the propriety of the director's rationale. As we have often said, a correct result will not be set aside merely because it was based upon incorrect reasoning. *Parker v. St. Elizabeth Comm. Health Ctr.*, 226 Neb. 526, 412 N.W.2d 469 (1987).

This brings us to the complaining objectors' contentions regarding the director's determination that the flows requested meet this standard. They contend that the director rejected the applicant's method of determining the required flows and therefore "erred in continuing to review the application and applying a different methodology . . . ." Brief for 25 Corporation at 18.

The fact is, however, that the director was presented with evidence as to the necessary flows based on several different

methodologies, including negotiated or institutionally prescribed settlements based upon scientific studies, historical evidence, and professional judgment and observations. Although the majority of the testimony centered on the one particular methodology advocated by the applicant, it was by no means the only methodology discussed in the record, nor were these methodologies the only evidence presented on minimum necessary flow.

Several of the experts discussed the methodology used by the director. One of the exhibits laid out the theory, explaining what information is needed for its application. It appears therefrom that in order to apply the director's methodology, the average annual flow of the stream segment must be determined. The record contains sufficient information to make this determination. The average annual flow is then multiplied by a percentage corresponding to the desired habitat quality. The resulting figure represents the flow regime which would sustain that habitat quality. The range of percentages developed by this methodology is from 60 to 100 percent for the "optimum range," 40 percent from October to March and 60 percent from April to September for "outstanding," 30 percent from October to March and 50 percent from April to September for "excellent," 20 percent from October to March and 40 percent from April to September for "good," 10 percent from October to March and 30 percent from April to September for "fair, degrading," 10 percent for "poor, minimum," and under 10 percent for "severe degradation." Since the existing flow is in the optimum range, it follows that any flow regime which reduces the habitat quality below that range would not be preserving or maintaining the existing fishery at its present quality. The director found that the 60-percent figure yielded results nearly identical to the flows requested by the applicant. Since the 60-percent figure represents the lowest end of the optimum range, there is nothing improper in the director's finding concerning it.

We also note that the director relied on more than this single method in reaching his conclusion that the requested flows were the minimum necessary to maintain the fishery. His order devotes considerable discussion to the evidence of a fish kill

attributed to high water temperatures resulting, in part, from a period of low stream flow. He observed that the flows during this period exceeded those requested by the applicant and that the applicant's experts stood by the 50 cfs and 60 cfs requests despite the fact that they would feel more comfortable with a higher rate. It is only after recounting this evidence that the director expressed the view that the requested flows are "in reasonable harmony" with the results obtained by the methodology he employed. Had the application sought to appropriate the entire unappropriated flow, the evidence of the fish kill might have been sufficient to support a finding that that was the flow necessary to maintain the fishery. However, the director is not empowered to grant a larger appropriation than that requested. In light of his reliance on the evidence concerning the fish kill, the director's application of the methodology he selected simply constitutes confirmation that the requested flows are appropriate under the statute even if the other factors which led to the fish kill never reappear.

Determining the minimum necessary flow for the maintenance of the use is a factual determination which, as noted earlier in part III(2), will not be disturbed unless it is unsupported by the evidence or is arbitrary, capricious, or unreasonable. In truth, the complaining objectors' thesis is not that there is no evidence concerning the methodology used by the director but that there is more evidence concerning the applicant's methodology. The relevant inquiry, however, is not the comparative volume of testimony concerning the two methods, see *Hillcrest Country Club v. N.D. Judds Co., ante* p. 233, 461 N.W.2d 55 (1990), but, rather, whether there is sufficient evidence to support the director's determination. Since there is, it cannot be said that the flow granted by the director is arbitrary, capricious, or unreasonable.

## 5. PUBLIC INTEREST

In the fifth summarized assignment of error, the complaining objectors assert the director misinterpreted and misapplied §§ 46-2,115(5) and 46-2,116, thereby erroneously concluding that the appropriation was in the public interest.

As discussed in parts III(1), (2), (3), and (4) of this opinion,

§ 46-2,115 requires the director to approve the application if certain specified requirements are met. The requirement set out in subsection (5) thereof is that the application be in the public interest. Section 46-2,116 sets forth the factors the director must consider in making that determination, namely, "[t]he economic, social, and environmental value of the instream use . . . ."

A public interest evaluation prepared for the applicant addressed the social, economic, and environmental value affected by the requested appropriation. A person involved in preparing the evaluation testified as to the factors she considered in reaching her conclusion that the application was in the public interest. These included balancing the present value of the instream flow to fish and wildlife, waste dilution and disposal, and recreation against the value of foreseeable out-of-stream uses which could be adversely affected by the appropriation. This evaluation did not attempt to quantify all of the social and environmental value into economic terms. Her conclusion was challenged by the complaining objectors' economist, who offered a purely economic analysis of the public interest.

Various members of the public testified; some recounted the benefits they have reaped as a result of the fishery, others voiced concerns and uncertainty about the requested appropriation, and still others simply aired their general distrust of and dissatisfaction with the applicant.

Complaining objector Zwiebel, a local farmer and representative of the Improvement Commission, testified as to his concerns about erosion in the drainage area and expressed the view that this job should be addressed "before we worry about the water in [Long] Pine Creek." Zwiebel stated that "the reason I bring [erosion] up is because the corrective action that needs to be done in that area might not be compatible with trout fishing or the instream flow right. I do not know. I could not pass judgment on that." Other witnesses confirmed the existence of erosion on the creek and mentioned possible control measures. Zwiebel and others also testified as to the use of surface water and ground water for irrigation in the area.

After finding that the use had positive social, economic, and

environmental value, the director considered the effect granting the appropriation would have on reasonably foreseeable alternative out-of-stream uses for the water. He concluded that because of the extensive and more easily exploitable ground water supply, there "is no evidence . . . that reasonably foreseeable alternative out-of-stream uses will be foregone or accorded junior status" if the application were approved.

The complaining objectors first argue that the director's determination was erroneous because "the majority of the testimony centered around what was omitted, unfinished or unstudied, rather than that which was covered in" the public interest evaluation study prepared for the applicant. Brief for Irrigation District at 26. Determining the weight that should be given expert testimony is uniquely the province of the fact finder. See *Hillcrest Country Club v. N.D. Judds Co., ante* p. 233, 461 N.W.2d 55 (1990). What one particular expert omitted from her consideration is irrelevant to our review if the record, as a whole, supplies sufficient competent evidence to support the director's conclusions.

The Irrigation District focuses on the study's "failure" to quantify the environmental and social value of the appropriation in dollar amounts, a quantification the Irrigation District apparently feels is required under § 46-2,116(1). To conclude that § 46-2,116(1) requires that all the factors considered be reduced to economic terms is, given the statutory language, simply untenable.

In its discussion of the public interest, the Irrigation District also asserts that all the appropriators along the stream were not made parties to this action and that they are necessary parties. This bald statement is the extent of its discussion of this issue; it does not provide any legal support for the assertion that these are necessary parties, nor does the Irrigation District attack the adequacy of the public notice given in accordance with § 46-2,114.

Complaining objectors Zwiebel and the Improvement Commission focus on the director's alleged failure to consider the effects of erosion and proposed erosion control measures on the value of the instream use. It is their contention that § 46-2,116(1) requires the director to offset the value of

alternative instream uses against the proposed instream use. If the alternative instream use is one which is likely to be pursued and is totally incompatible with the proposed use, then there is some merit to their position. The complaining objectors claim that the director misconstrued the statute and failed to perform this offsetting. To support this claim, they simply reargue the evidence and conclude that because the director reached an unfavorable result, error was committed. The determinations of whether an alternative instream use is likely to be pursued and whether it is incompatible with the requested use are, of course, questions of fact. The director was presented with the evidence relied upon by the complaining objectors, weighed it, and concluded that there was "no *significant* evidence of a negative nature [regarding the value of the instream use]." (Emphasis supplied.)

Thus, the several arguments of the complaining objectors are nothing more than attempts to entice this court into reweighing the evidence. However, as repeated before, when presented with an appeal from an order of the Director of Water Resources, this court does not reweigh the evidence; its review is limited to a search for errors appearing in the record.

### 6. BOUNDARIES

In the sixth summarized assignment of error, the complaining objectors assert that (1) the director lacked the authority to change the upstream boundary from that requested in the application, and (2) even if the director does have the authority to decrease the length of the stream segment, he exercised that authority in an arbitrary, capricious, and unreasonable manner. In assessing these contentions, we first note that administrative bodies have only that authority specifically conferred upon them by statute or by construction necessary to achieve the purpose of the relevant act. *Nape v. Game & Parks Comm.*, 220 Neb. 883, 374 N.W.2d 46 (1985). We also note that the director and the Department of Water Resources are given broad authority over the appropriation and use of water in Nebraska. See, *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987); Neb. Rev. Stat. § 46-209 (Reissue 1988).

Section 46-2,109 empowers the applicant to "conduct studies to identify specific stream segments which [it] considers to have a critical need for instream flows." Section 46-2,110 requires applications for instream flow appropriations to "include the locations on the stream at which the need for instream flows begins and ends . . . ." As noted in part II of this opinion, the beginning and ending points of the segment for which the application was requested are the confluence of Bone Creek and the boundary of Ranges 20 and 21 West, in Township 29 North, Brown County, with three different flow rates at different sites along the creek. Several times during the hearing, the applicant's witnesses testified that the application consisted of a single stream segment with flows measured at three points, rather than three separate segments. In granting the application, the director, because of his denial of the requested flow at the upper study site, moved the upstream boundary from the boundary of Ranges 20 and 21 West several miles downstream to the Highway 20 bridge crossing.

We have already discussed the criteria for approving an instream flow application set forth in § 46-2,115, including the requirement that the rate and timing of the flow be the minimum necessary to maintain the use. The final sentence of § 46-2,115 permits the director to reduce this rate and timing and thus gives him the ability to grant a reduced appropriation rather than deny the application in its entirety.

Section 46-2,118(1) limits application of the instream appropriation to "that segment of the stream for which the appropriation is granted" and states that the segment "shall be defined specifically by the Director . . . in the permit."

The complaining objectors contend that once the director determined that the requested flow at the upper site should be denied, he should have denied the entire application. Although there is nothing in the statutory language expressly authorizing the director to reduce the length of the stream segment, the complaining objectors' all-or-nothing approach contravenes the policy behind the final sentence of § 46-2,115. By permitting the director to reduce the requested rate and timing of the flow, the Legislature implicitly rejected the complaining objectors' approach in order to avoid the denial of a needed

appropriation simply because the application asked for too much. The reason is clear: rather than being forced to deny an excessive appropriation, the director may limit the appropriation to the extent required by the public interest. This way, an instream use that requires protection will not be left unprotected simply because the applicant asked for a flow which the director later determines is greater than that which is the minimum necessary.

Here, the director was faced with an application which asked for too much. Under § 46-2,115, the director could have "reduced" the application's requested rate of flow at the upper site to zero, kept the requested rates for the remainder of the segment at the requested levels, and left the segment boundaries as they were in the application. Instead, he "denied" the application for the upper site and moved the segment boundary downstream. The net effect is essentially the same, except that the director's method avoids the fiction that the upper reach is part of the protected stream segment. Had the director taken the first approach, the complaining objectors would be in no better position. We therefore hold that when an instream flow application requests different flow rates at different locations along a single stream segment, the denial of the application as to one location is to be viewed as a reduction in the requested rate of flow as authorized by § 46-2,115. Any reduction in the length of the stream segment occasioned by such a denial is but incidental to the flow reduction, and the director may define the stream segment under § 46-2,118(1) in such a way as to reflect the appropriations as granted.

Having thus determined that the director did not exceed his authority in diminishing the length of the stream segment, we turn to the question of whether his determination of the new upstream boundary was arbitrary, capricious, or unreasonable. A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. *Percival v. Department of Correctional Servs.*, 233 Neb. 508, 446 N.W.2d 211 (1989); *In re Application of Renzenberger, Inc.*, 225 Neb. 30, 402 N.W.2d 294 (1987). A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a

decision is apt to change suddenly; it is freakish, whimsical, humorsome. *United States v. Carmack*, 329 U.S. 230, 67 S. Ct. 252, 91 L. Ed. 209 (1946); II The Oxford English Dictionary 869 (2d ed. 1989). The term "unreasonable" can be applied to an administrative decision only if the evidence presented leaves no room for differences of opinion among reasonable minds. *South Cent. Bell Tel. v. Public Serv. Com'n*, 702 S.W.2d 447 (Ky. App. 1985). The issue, therefore, is whether the record provides the director with a rational basis for choosing the Highway 20 bridge crossing as the upstream boundary of the stream segment.

As part of a 1978 study analyzing different instream flow methodologies on the creek, one of the applicant's experts divided the creek into reaches with essentially homogeneous characteristics. The Highway 20 bridge was the upstream boundary of one of these reaches. The applicant's middle study site, the measuring point for the 50 cfs instream appropriation, is in the middle of this reach. Just upstream from the bridge, there are stream improvement structures which the expert indicated produced an environment sufficiently different from that of the reach downstream from the bridge as to require separate analysis, an analysis which was never made. The data from the 1978 study were used in formulating the appropriations requested by the applicant. Since the Highway 20 bridge marks a change between the area represented by the middle site (where the requested 50 cfs flow was approved) and the upper reaches of the stream (where the requested flow was denied), the director's choice of the bridge as the upstream boundary was not arbitrary, capricious, or unreasonable.

The complaining objectors caution us not to confuse the segmentation performed as part of the applicant's methodology to study the instream flows with the statutory segment designation provisions. Whether this dichotomy is meaningful is a matter we need not decide, for we can, and do, assure the complaining objectors we are not confusing the two. We merely recognize that some of the reasons which led the applicant's experts to choose the Highway 20 bridge as a boundary also provide a rational basis for the director's choice of the bridge as the upstream boundary of the designated

stream segment.

## 7. STIPULATION

The crux of the seventh and final assignment of error is the complaining objectors' contention that the director committed an arbitrary act by agreeing to and approving the stipulation between the applicant and objector-appellee Long Pine and the resulting amendment to the application described in part I. They contend that the director

> allowed [Long Pine and the applicant] to treat the spring water used by . . . Long Pine as ground water, to the exclusion of all other springs feeding Long Pine Creek, and that he had no reasonable basis to separate the springs that supply the water for . . . Long Pine or differentiate those springs from all other springs that feed Long Pine Creek.

Brief for Irrigation District at 32. "Ground water" is defined as water which moves, seeps, filters, or percolates through the ground under the surface of the land. Neb. Rev. Stat. § 46-635 (Reissue 1988).

First, we must make clear that, contrary to the complaining objectors' contentions, the stipulation does not "exclude" other springs from being treated as ground water, nor does it "determine that one spring is and the next spring isn't ground water." Brief for Irrigation District at 34. The stipulation is silent as to how other springs are to be treated. Having corrected the complaining objectors' misimpression concerning the treatment of springs, we turn to the reasonableness of the director's action.

The complaining objectors assert in this regard that there is no reasonable basis for singling out Long Pine's municipal facility from other springs along the creek. This is not the case. First, the complaining objectors do not point to any party seeking a similar stipulation. Second, the Long Pine facility is distinguishable from the natural springs which are tributary to the creek. Long Pine's municipal facility taps several springs below ground, collects that water into an underground chamber, and then pumps the water into its pumphouse. The water is captured before it ever has an opportunity to become

surface water. There is no evidence that the facility is capable of capturing water in any other manner. The facility is registered as a well with the Department of Water Resources. These facts are sufficient to provide a rational basis for treating the water captured by the Long Pine facility as ground water. The complaining objectors do not claim that there are other, similar facilities that are being treated as capturing surface water, but they do complain that there was no determination made as to the classification of all the various springs along the creek. They do not demonstrate why such a determination should be necessary or why water captured in a municipal well should be treated in the same manner as water which reaches the surface via a natural spring. Finally, they fail to demonstrate any prejudicial effect flowing from the director's acceptance of the stipulation.

## IV. DECISION

The statutes permitting instream flow appropriations, §§ 46-2,107 through 46-2,119, not offending Neb. Const. art. XV, § 4, 5, or 6, and the record failing to sustain the summarized errors assigned to the director, we affirm.

AFFIRMED.